FILED

2011 Nov-07 PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | | |
|---|---|---|
| **KERRY G. BRATTON,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| **v.** | ] | |
| | ] | |
| **CITY OF BESSEMER, et. al.,** | ] | **CV-10-BE-1854-S** |
| | ] | |
| **Defendants.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This case, asserting federal claims of race discrimination and FLSA violations as well as a violation of state statutory law, is before the court on "Defendants' Motion for Summary Judgment" (doc. 18); "Defendants' Motion to Strike Inadmissible Hearsay Testimony" (doc. 30); Defendants' "Motion to Strike Inadmissible Testimony of Michael Leavitt" (doc. 31); and Defendants' "Motion to Strike Evidence of Non-Similarly Situated Employees" (doc. 32).  For the reasons stated in this Memorandum Opinion, the court finds that the motion to strike inadmissible hearsay is due to be GRANTED; the motion to strike Leavitt's testimony is due to be DENIED; the motion to strike evidence of non-similarly situated employees is due to be DENIED; and the motion for summary judgment is due to be GRANTED in part and DENIED in part.

## I.  FACTS

Bratton's Employment with the City of Bessemer

On September 4, 2009, Defendant Edward May, Mayor of the Defendant City of

Bessemer, hired Plaintiff Kerry G. Bratton, a Caucasian, as a Water Utilities Serviceman. However, the Mayor did not meet or interview Bratton in connection with his application; Michael Leavitt, the City's water superintendent, and a man named "Buster," both Caucasians, interviewed him, and the Mayor signed off on the hire.  The Mayor testified that he did not meet Bratton until the depositions for the instant lawsuit and did not know his race during the time the City employed him or at the time the Mayor terminated his employment.  Although the "Undisputed Facts" listed in the briefs do not specifically state the Mayor's race, the court takes judicial notice that Mayor May is African American.  Bratton's duties as serviceman included repairing water mains, working on meters, working on fire hydrants, and taking call when necessary during evenings and weekends.

During Bratton's first month on the job, he became good friends with Robert Lewis, an African-American co-worker.  After that first month, a group of black employees, including Sam Harris, Christopher Levins and Justin Kemp, verbally attacked Bratton at a meeting, cussing at him, throwing racial slurs at him such as "sorry white m____-f_____," and stating that they wanted a black man in the serviceman position instead of Bratton.  Many if not all of these workers were in helper positions, a lower position than the serviceman position, and the Mayor had previously denied promotions to Harris and Levins. Superintendents and supervisors for the City's utility were present at the meeting to witness the verbal attack: Michael Leavitt, the City's water superintendent, who is Caucasian; and Terry Edwards (Causcasian), Curtis Parker (African American), and Willie Reeves (African American), all water distribution supervisors.  At the meeting, Bratton asked Leavitt whether he was going to allow the group of African Americans to attack Bratton.  When Leavitt did not take a stance,  Lewis stood up at the meeting and accused

the co-workers of attacking Bratton because he was white and because they were mad he had been hired at the higher level of serviceman.

Levins and Kemp claimed they had special access to Mayor May and "flaunted" that access, telling Bratton that they could "get something done" about Bratton's starting work with the City at the elevated position of serviceman. (Pl.'s Dep. 89, Doc. 23-1).  Kemp bragged: "You can't do shit to me, Ed May will not let you."  (Pl.'s Dep. 54, Doc. 23-1).  Another time, Levins, Kemp, and another African American named "Big Sam" informed Bratton and Lewis that they had met with May and informed him that Bratton and Lewis did not yet have their commercial driver's licenses.  According to Jefferson County board rules, the employees were supposed to obtain this license within a year of their hire date, but Bratton and Lewis did not yet have theirs. However, the group did not state that they had mentioned Bratton's race to the Mayor.  Kemp informed Bratton that Kemp was "going to get your white ass fired. . . I don't like you because you are white. . . .you don't deserve that job."  (Pl.'s Dep. 104-7).  According to Parker and Leavitt, Kemp made similar statements about having "the mayor in my back pocket" to Parker, Edwards, and Leavitt.  (Parker Dep. 20; Leavitt Dep. 42).

The Mayor acknowledged that he knew Kemp's mother who was on the City Council during the Mayor's first term of office, that he was aware her son worked for the City, and that Kemp's mother talked to the Mayor about her son "some times."   The Mayor specifically recalls Kemp's mother calling him and complaining that her son was being mistreated and discriminated against, and the Mayor followed up with Nevins about her complaint, determining that no basis existed for it.  However, the Mayor recalls only meeting Kemp one time, a chance encounter in a Shop Snack store, and does not recall any other communication with Kemp.  The Mayor's

secretary recalls Kemp twice leaving plain envelopes – that were not interoffice mail – with her for the Mayor, but does not recall any meeting between Kemp and the Mayor, and the Mayor does not recall receiving Kemp's envelopes.

Kemp testified in his deposition that he had no meetings with the Mayor discussing Bratton. He did stop by the Mayor's office to leave an envelope on one occasion, and it contained information about a doctor's excuse from work but contained no reference to Bratton.

Whether Kemp indeed had any special relationship with the Mayor, Bratton testified that Kemp particularly was a problem employee but yet was never demoted or terminated. He gave as one example that a group of employees were on the job to fix a broken water main when Justin Kemp called Bratton an "ignorant white boy," cussed at him, and threatened to "stomp the living shit out of [Bratton]." (Pl.'s Dep. at 24, Doc. 23-1). After Bratton returned to the office from the job site, he reported the incident to Edwards, Reeves, Parker, and Leavitt. The supervisors "wrote up" Kemp and gave him a verbal warning. Kemp would also regularly make threats, such as "I will kill your ass. I will have you knocked off" directed at white employees, including Bratton, but not black employees in the utility's back break room. (Pl.'s Dep. at 49-50, Doc. 23-1). Bratton complained about Kemp's threats to the utility supervisors and Leavitt.

Further, Kemp refused daily work pairings with employees with whom he did not want to work, both black and white, and in response to the pairings he would throw a fit, cuss, refuse to work, and would instead "go to the back room, watch TV for eight hours," after insisting "You can't do shit to me. I will go to Ed May." (Pl.'s Dep. at 54-56, Doc. 23-1). Both black and white employees complained to the three supervisors regularly about Kemp's actions, and many utility employees did not want Kemp paired with them. According to Bratton, the supervisors warned

4

Kemp verbally and in writing, but Kemp continued his actions and kept his job.

On still another occasion, Bratton complained to Edwards that Kelvin Dunn had threatened to "whip his tail," and Edwards reported the incident to Leavitt. (Edwards dep. 19, Doc. 23-9). Kemp, Levins, Kelvin Dunn, and "Big Sam," all African-Americans, often harassed Lewis and Bratton for their close working relationship, making remarks like "Look at the black and white boy, they are kissing each other's ass." (Pl.'s Dep. 106-07, Doc. 23-1).

Leavitt, Edwards, Parker, and Reeves all agreed that during Bratton's tenure at the utility job, he was one of their better employees, did as he was told, came to work reliably, and was technically proficient at his job.

Cold Snap of January 2010

The genesis of the FLSA part of this case is a cold snap that occurred in January 2010. During that cold snap, many utility employees of the City of Bessemer worked overtime during a two-week pay period. To keep track of overtime, the City used both an electronic time clock and also handwritten time reports that employees filled out and that supervisors had to approve. However, the time clock was newly installed in January of 2010 and still had some "bugs" to work out; it malfunctioned during that month and to add to the problems, confusion existed as to when employees were supposed to clock in.

Eleven water service employees, including Bratton, reported working more hours than the City's time clock reflected. According to a procedure the Mayor established, the Mayor personally reviewed overtime sheets that the employees submitted, and the City initially paid all eleven water service employees for overtime during that two-week period based on the time clock reports and not the time sheets. The entire group of eleven, seven of whom were

Caucasian and four of whom were African-American, complained that the amount of overtime paid based on the time clock was "short" and that they should be paid instead based on their time sheets, which they claimed were accurate reflections of the hours actually worked.  Based on these complaints, superintendent Leavitt sent a memorandum to Ida Taylor, the City's utilities chief accountant.  This memorandum, which four water distribution supervisors also signed, stated that "an actual time sheet signed by the supervisor overrides the time clock;" the City should pay overtime based on the "true" time worked reflected on the time sheets and approved by supervisors, as opposed to the time reflected on the clock.  The memorandum also stated that "we can dock pay later if needed," indicating that some of the time sheets may include miscalculated time.  (Doc. 23-6, at 21).

The City investigated this matter by holding individual meetings: each of the eleven water service employees, including Bratton, met with Taylor, Leavitt, two water distribution supervisors, and Charles Nevins, the Bessemer Utilities Operations Manager.  In the meetings, the employees were asked to substantiate the overtime hours they reported on their time sheets. Subsequently, the City issued a second check to each of the employees reflecting the additional overtime that the City determined the employees had substantiated.

As a result of the investigation, the City concluded that nine of the eleven utilities employees who complained about January 2010 overtime pay, including Bratton, had miscalculated their overtime reported on the time sheets.  In Bratton's case, he originally claimed on his time sheets a total overtime of 116.5 for the two-week period in question.  This figure appears to be an extremely high number of overtime hours in a week, even at an extremely busy time, so an explanation of how hours are calculated is helpful.  In addition to hours actually

worked, a City serviceman receives "duty hours" for being "on call."  The City pays an employee two duty hours per night on call Mondays through Friday and three duty hours per night on call on Saturdays and Sundays.  Thus, if an employee is "on call" and works twenty-four hours straight with no breaks, he may accurately record twenty-six hours per day during the week and twenty-seven hours per day on weekends.

The City initially paid Bratton, who is Caucasian, 48.35 hours of paid overtime based solely on what the time clock reflected as the overtime he worked during that period.  In the individual meeting about his time records, Bratton agreed that he had made some mistakes calculating the overtime because of his inexperience; January 2010 was his "first time on call." (Pl.'s Dep. at 157, Doc. 23-1).  For example, on Tuesday, January 12, 2010, Bratton submitted a time sheet indicating that he worked 8 regular hours and 17 overtime hours for a total of 25 actual hours plus two "on duty" hours, making the total hours submitted 27 in that day.  As another example, on Wednesday, January 13, 2010, Bratton submitted a time sheet indicated that he worked 8 regular hours and 18 overtime hours for a total of 26 actual hours plus two "on duty' hours, making the total hours submitted 28 for this day.  The City determined that he could substantiate 104 of the 116.5 overtime hours he had originally submitted on his time sheets, and the City sent Bratton a second check paying for an additional 55.65 hours of overtime.  Bratton claims that he substantiated more hours, and points to the January 22, 2010 letter that Clint Crane wrote to the City, complaining about the amount of overtime the City paid him during the January 2010 cold snap.  However, Crane's letter does not provide specific hours he worked with Bratton.

On January 27, 2010, Nevins sent a memorandum to the Mayor, advising him of the

7

result of the review of the "individuals that had not documented their time correctly" for January 2010.  (Doc. 26-2).  Noting that "Kerry Bratton, hired on 9/3/09, was the only employee that has been hired or promoted within the last year," Nevins then listed the adjustments for each employee affected, stating the hours in dispute, the hours recommended, and the difference between the two.   According to Bratton,  Robert Lewis, an African-American, had also received a promotion about the same time as Bratton was hired and was also one of the eleven employees listed, so this statement was apparently incorrect.   The difference between the hours in dispute and the additional hours the City recommended ranged from 0 to 12.5.  Bratton and one other employee had the highest difference of 12.5 between hours in dispute and recommended hours.  Levins's memorandum did not state the race of the employees claiming entitlement to more overtime, and did not include pictures of them or otherwise reveal their races.

Bratton's Termination

As noted previously, Bratton's employment with the City began a few months before the cold snap in September of 2009.  Under the Jefferson County Personnel Board ("JCPB") Rules and Regulations, once an employee is initially hired, he must complete a one-year probationary period.  During this new hire probationary period, an employee "may be dismissed, demoted, or suspended without the right to appeal."  (Doc. 23-12, at 47, Rule 11.6 b.).   After a new employee completes his probationary period, he becomes a "Regular Employee" under the JCPB Rules.  In contrast to newly-hired probationary employees, the JCPB Rules provide that a Regular Employee can only be terminated for cause.  If a Regular Employee is later promoted, that employee enters a probationary period during which he "may . . .be subject to demotion or elect to return to the position from which he or she was promoted, if still vacant." (Doc. 23-12, at 47,

8

Rule 11.6 d.).  However, unlike the newly-hired probationary employee, a recently promoted probationary employee can only be terminated for cause because of his status as a Regular Employee.  The Mayor's secretary testified that the City's practice is to give Regular Employees who are terminated a reason for their termination, but that the City's practice is that new hire probationary employees do not need to be given a reason for their termination[1].

May made the decision to terminate Bratton's employment the first week of March 2010. He testified that he made the decision after receiving the January 2010 memorandum from Nevins and understood based on that document that nine of the employees listed had padded their overtime.  According to May, he terminated Bratton because Bratton was in his new hire probationary period and had improperly recorded his overtime.  The Mayor acknowledged that if Bratton had not been on probationary status, he would not have terminated him.   May further testified that Nevins had identified Bratton as a probationary employee "and that would be the best way to handle him."  (May dep. at 19, Doc. 23-2).  In his affidavit, May testified that he was unaware of Bratton's race at the time he hired him and at the time he terminated him, and May stated in his deposition that he did not recall meeting Bratton prior to Bratton's deposition in this lawsuit.

According to May, he was not aware of previous incidents in which black employees had padded their overtime and were not terminated.  However, his secretary testified that she would receive on the Mayor's behalf written disciplinary actions, for second and subsequent offenses,

---

[1] Although the secretary initially stated in her deposition that the City's practice was to give probationary employees a reason for their termination, she corrected herself in the same deposition and said that the practice was to give regular or classified employees but not newly-hired probationary employees a reason for termination.  (Doc. 23-5, at 36, 54-55).

that supervisors would document regarding employee discipline. She acknowledges receiving written disciplinary action regarding both white and black employees and recalls receiving multiple written disciplinary actions regarding Kemp and also Kelvin Dunn, who are both African American. However, she did not list Robert Lewis as someone she recalls receiving written discipline reports in the Mayor's office. The Mayor's secretary recalls several City employees complaining to the Mayor's office about race discrimination, but those employees were African American.

Bratton learned he was being terminated on March 4, 2010 in a meeting with Michael Leavitt and two other water service supervisors. In the termination meeting, Bratton received a letter that Nevins wrote dated March 4, 2010, stating "Your probationary period has not been completed, and management has decided to dismiss you from your current position." (Doc. 26-3). The letter does not give a reason for his dismissal.

Bratton asked why he had been terminated. Because the letter did not explain the reason for the dismissal and because the supervisors knew Bratton was a good employee, neither Nevins, Leavitt, Edwards nor Reeves knew the answer at that time. Because Bratton did not have a car at work, Leavitt gave him a ride home that day. In his deposition testimony, Leavitt stated that he speculated during the ride home that the City had terminated Bratton because Bratton had not yet obtained his CDL license and mentioned this possibility to Bratton; however, Leavitt did not inform Bratton that it was the definite reason. Leavitt also reminded Bratton that he was in his first-year probationary period. Although Bratton thus understood that he had been or may have been terminated for not having a CDL license and showed Leavitt paperwork where he had signed up for a CDL training class, Leavitt explained that the Mayor had made the

10

decision and that it was out of Leavitt's hands.  According to Bratton, Leavitt said, "You know

what we are fighting against. . . .You know down at the City of Bessemer.  It is white versus

black."[2]  When Bratton asked why Leavitt had not stood up for him, Leavitt responded, " I will

definitely not go up against Ed May because I will not lose my job and not be able to feed my

family by losing my job fighting for you."  (Pl.'s Dep. at 71, Doc. 23-1.).  Leavitt denies making

any direct reference to race in this conversation.

Potential Comparator Information

Other than Bratton, no employees were terminated or disciplined for discrepancies

between time clock records and their written time sheets during the two week pay periods in

question.  As noted previously, one of the employees who was not terminated is Robert Lewis, an

African American.  Lewis was a Regular Employee serving a probationary year after a promotion

to serviceman from helper, his probationary period beginning about the same time as Bratton's.

However, Nevins's January 27, 2010 memorandum to Mayor May did not list Lewis as serving

in a probationary period. Although Lewis miscalculated his overtime by approximately four

hours, he was neither demoted nor terminated from his position as a result of that miscalculation

despite his probationary status.  Lewis was eventually demoted back to helper because he did not

receive his CDL license within a year.

Prior to the January 2010 cold snap incident, utilities employees had been caught

overstating their overtime.  In 2008, a group of six African American employees worked on a

---

[2] Leavitt denies referencing race but acknowledges that he may have refused to go to bat with the Mayor on Bratton's behalf because he wanted to keep his job.  He also acknowledged telling Bratton that he simply could not talk about everything affecting the job situation, and explained in his deposition that he personally believed a racial component existed in the decision on Bratton's employment.

weekend and overstated the number of hours worked.  None of the employees was terminated but their immediate supervisor gave them written discipline.  However, those employees' hire dates indicated that none of those employees was a newly-hired probationary employee in 2008. According to Leavitt, two of those same employees had a subsequent incident of overstating hours before the January 2010 cold snap, but were not terminated.

Bratton's Complaint

On July 12, 2010, Bratton filed the instant suit, asserting five counts: Count One alleging an FLSA violation against the City; Count Two alleging that the City retaliated against him for his complaints regarding FLSA violation(s); Count Three alleging race discrimination pursuant to Section 1981 via Section 1983 against the City; Count Four alleging race discrimination pursuant to Section 1981 against Mayor Ed May; and Count Five alleging a violation of Alabama Code Section 11-43A-45 against the City, an Alabama law that prohibits discrimination with respect to any municipal position.

Other Alleged Discrimination

Because one of the motions to strike addresses evidence about May's alleged prior discriminatory treatment of Leavitt, the court will also explain what that evidence entailed. A few years before the incident made the basis of this suit, the City passed over Leavitt for two positions he requested and gave those positions to African Americans.  Leavitt filed a lawsuit alleging race discrimination against the City because of those personnel decisions. In June 2010, a few months after Bratton's termination, Leavitt filed an EEOC charge of race and disability discrimination and discriminatory retaliation against the City, alleging, among other things, that May would not discipline the City's black employees when Leavitt recommended such discipline

12

with supporting documentation, but that May disciplines white employees.

## II.  MOTIONS TO STRIKE

Defendants filed three motions to strike.  The court will address those motions before addressing the dispositive motion.

A.  Defendants' Motion to Strike Inadmissible Hearsay (doc. 30)

In this motion, Defendants move to strike the following testimony as hearsay.

1.  *The Mayor's statement, supposedly made to Leavitt before Bratton's termination, that "I don't remember signing off on hiring [Bratton].  I didn't know he was white."*

Bratton does not include this statement in his brief's disputed or undisputed facts but does refer to it in a footnote of the argument section of the brief.  Although the parties took the depositions of the May and Leavitt, their deposition testimony does not support this statement; both flatly denied that May ever said those words.  Faced with those denials, the only support that Bratton's footnote offers for this "evidence" are his own Answers to Defendant's interrogatories, when Bratton recounts what Leavitt supposedly told him that May had said.  As Defendants correctly argue, Bratton was not present when May supposedly made this statement to Leavitt, and Bratton's attempt to recount what Leavitt supposedly said the Mayor said is classic hearsay. *See* Fed. R. Evid. 801 & 802.  In light of the deposition testimony of both May and Leavitt, the statement cannot be reduced to admissible evidence.  The statement does not fall under an exception to the hearsay rules.  Therefore, the court finds that the motion to strike is due to be GRANTED as to this statement.

    2. *The statement of Kemp, Levins, and "Big Sam" that they had informed May about the failure of Bratton and Lewis to obtain CDLs.*

The court has attempted to find the relevance of this statement.  One crucial issue in this case is whether the Mayor knew of Bratton's race at the time of termination.  If the group bragged about having a meeting with the Mayor in which they advised him of Bratton's *race*, this statement would be relevant, but it only refers to the failure to obtain CDL licenses, which have nothing to do with race.  In their deposition testimony, both Kemp and the Mayor denied that this meeting took place, and Bratton provides no verification that it did. Thus, the court finds that no evidence exists that such a meeting occurred. Given the testimony of Kemp and May, the court does not see how the statement could be reducible to admissible evidence.  For all of these reasons, the finds that the motion to strike is due to be GRANTED as to this statement.

B.  Motion to Strike Inadmissible Testimony of Michael Leavitt (doc. 31)

    1. Lay Opinion Testimony

In his deposition testimony, Leavitt acknowledges that the Mayor did not consult with him regarding Bratton's termination, and that he did not know the reason for the termination. However, he testified that he personally believed that race was an aspect of the termination. Prior to the date of his deposition, Leavitt had worked for the City for a number of years and over the years, the City had not accepted recommended disciplinary actions against black employees and had passed Leavitt over for promotion.  Leavitt had filed suit against the City and an EEOC charge, both alleging race discrimination.  Evidentiary Rule 701 allows a lay witness to testify in the form of an opinion provided such testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding

14

of the witness's testimony or the determination of a fact or issue. . . ." Fed. R. Evid. 701.

Further, as supervisor of Bratton who was also involved in dealing with the January 2010

overtime problem, Leavitt had some basis for his opinion.  The court DENIES the motion,

because the court is capable of disregarding lay opinions to the extent they are not rationally

based on the witness's perception and/or not helpful.  If Bratton is able to meet his *prima facie*

case, the court will further address this testimony to determine whether it is relevant to Bratton's

pretext arguments.

　　　　2.  "Me Too" Testimony

　　　　Defendants argue that Leavitt's testimony about May's discriminatory treatment of

Leavitt is immaterial, irrelevant and highly prejudicial.  However, May's alleged discriminatory

treatment of Leavitt, a white man, based on race is relevant to Bratton's claims of pretext.   To

the extent that Defendants raise the prejudicial nature of this evidence, the court is capable of

examining the evidence without being unfairly prejudiced.  Therefore, the court DENIES the

motion as to the evidence, and will address that evidence if Bratton establishes his *prima facie*

case.

C.  Motion to Strike Evidence of Non-Similarly Situated Employees

　　　　Defendants ask the court to strike all testimony and references in Bratton's response to

comparators who were not in their new hire probationary period. Nine utility  employees were

involved in the same incident with overtime miscalculations, although none of the nine except

Bratton was in his new hire probationary period.  Other than Bratton, Robert Lewis was

apparently serving a probationary period, but because it was a probationary period after

promotion, not a new hire probationary period, he was not subject to the same rule as Bratton; as

a "Regular Employee," Lewis could only be fired for cause where Bratton could be terminated for no reason at all.  Because which employees, if any, are appropriate comparators is one of the essential issues in this case, the court will not strike all testimony and references to alleged comparators at this preliminary point but will discuss this issue in the body of its opinion.  Therefore, the court DENIES this motion.

### III.  MOTION FOR SUMMARY JUDGMENT

A.  Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

16

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant. *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving

17

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988). The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and

inferences drawn from the underlying facts must be viewed in the light most favorable to the

non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the

benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment,

the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

B.  Discussion

As noted previously, Bratton asserts the following claims: Count One - FLSA violation

against the City; Count Two - FLSA retaliation against the City; Count Three - race

discrimination against the City pursuant to Section 1981; Count Four - race discrimination

against Mayor May individually pursuant to Section 1981; and Count Five - violation of Ala.

Code § 11-43A-45, an Alabama law that prohibits discrimination with respect to any municipal

position.

1.  FLSA Violation

To establish a *prima facie* case of an FLSA violation, a plaintiff must show "as a matter

18

of just and reasonable inference," the amount and extent of his work to demonstrate that he was inadequately compensated. *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1513 (11th Cir. 1993). The Eleventh Circuit has explained that to receive uncompensated overtime, a plaintiff must show that (1) he worked overtime hours without compensation; and (2) his employer "knows or has reason to believe" that the employee worked overtime. *Reich v. Dep't of Conservation and Natural Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994).

Bratton initially claimed that he worked 116.5 overtime hours in January 2010 and that the City only paid him for 104, leaving 12.5 overtime hours in dispute. However, Bratton acknowledged that he made some mistakes in calculating his overtime in January 2010. Indeed, he has no choice but to make that acknowledgment; his time cards reflect time totals that are either intentionally padded or inadvertently miscalculated. For example, when the City officials reviewed Bratton's time cards, they pointed out that, in addition to his "duty hours," he had recorded working more than 25 actual hours one day and 26 actual hours the next. Obviously, Bratton's original claim to working 51 hours in 48-hour time period is an impossible feat, and thus, at least three hours must be subtracted from the original total of 116.5, leaving only 9.5 overtime hours in dispute. Bratton provides no diary or notes as support for his claim for this total, but he does have time sheets verified by a supervisor's signature. He also proffers a letter from Clint Crane that provides no concrete hours and dates worked with Bratton, and is therefore less than helpful. Given the verified time sheet evidence, however, the court FINDS that a question of fact for the jury exists as to whether Bratton worked the additional 9.5 hours and, if so, whether the City had knowledge of the overtime. The motion for summary judgment is due to be DENIED as to the claim against the City for violation of the FLSA.

19

In their reply brief, Defendants incorrectly state that Bratton acknowledged in deposition testimony "that it was possible he was only *due* to be paid for 104 overtime hours." (Reply Br., doc. 29 at 11).   Instead, he testified that he may have been *paid* for a total of 94 or 104 overtime hours; he could not remember which.  The record clarified that he was paid for 104 hours. Bratton's testimony is different from the way Defendants characterize it.  In questioning Bratton's "inadvertent" miscalculations, Defendants must be careful not to make inadvertent misstatements of their own.

2.  FLSA Retaliation

The FLSA provides that an employer may not "discriminate against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).  Complaints sufficient to trigger that provision may be informal.  *EEOC v. White*, 881 F.2d 1006, 1011 (11th Cir. 1989).  To establish a *prima facie* case of retaliation under the FLSA, a plaintiff must demonstrate (1) that he engaged in activity protected under the Act; (2) that he subsequently suffered an adverse action by the employer; and (3) that a causal connection existed between the protected activity and the adverse action.  *Wolf v. Coca-Cola Co.,* 200 F.3d 1337, 1342-43 (11th Cir. 2000). If the employer articulates a legitimate, non-retaliatory reason for the adverse action, then the plaintiff has the burden to show that the reason is a pretext for retaliation.  *Id.*

The court finds that Bratton has met his *prima facie* case.  He complained in January 2010 that he was not properly paid for overtime, and City records document that complaint.  Five or six weeks after his complaint, the City terminated him.  Because of the close temporal proximity between the complaint and the adverse action, the court finds that Bratton has

20

established an arguable causal connection.  As Bratton acknowledges in his responsive brief, Defendants articulated a legitimate non-retaliatory reason for his termination: that he was a probationary employee who had miscalculated his overtime.  However, Bratton predictably argues that the reason was pretextual.  In support of that argument, he points to the fact that City did not inform Bratton why he was terminated and that the City did not even discipline the other employees that had committed the same infraction he had in miscalculating overtime.

The court finds that Bratton has not met his burden to establish pretext.  Eleven employees complained of FLSA overtime payment violations and only Bratton was terminated. The Mayor gave a legitimate, non-retaliatory reason for Bratton's termination – that he was a newly- hired probational employee who miscalculated his time – and Bratton fits that non-retaliatory reason.

Bratton argues that he was low hanging fruit: the City wanted to retaliate and he was the only one who could be easily terminated without the right to appeal.  Bratton is correct that he, as a probationary employee, had no right to appeal his termination; he could be terminated for no reason or any reason, even a bad, unfair reason, that did not violate federal law such as FLSA and anti-discrimination laws.  Indeed, the City did not give a reason for the termination of his probationary employment at the time, and contrary to Bratton's argument, it did not have to do so on his termination notice.  However, the court cannot automatically assume  –  because the City had the right to terminate Bratton for no reason and because the City did not state a reason on his termination notice – that the City necessarily terminated him for a *retaliatory* reason.

Although the City did not have to articulate a reason for Bratton's termination at the time, in this suit, after Bratton established his *prima facie* case of FLSA retaliation, the City *was*

required to articulate a non-FLSA-retaliatory reason for the termination, and it has done so.

Now, the burden is on Bratton to establish that the reason was a pretext for FLSA retaliation.  Put

another way, the City does not have the burden to establish that its reason was not pretextual and

the court may not simply assume that it is pretextual without *evidence* supporting pretext.  As to

the FLSA retaliation claim, Bratton has not met his burden to rebut that reason with *evidence.*

Therefore, the motion for summary judgment is due to be GRANTED as to the FLSA retaliation

claim.

3.  Race Discrimination

The last two federal counts allege that the City and the Mayor discriminated against

Bratton on the basis of his race in violation of Section 1981. At the outset, the court notes that

Bratton has sued the Mayor in his individual capacity and the Mayor has raised qualified

immunity in his Answer (doc. 6, 26th Defense).  However,  the Mayor has filed no motion

requesting dismissal pursuant to qualified immunity and does not specifically discuss his

entitlement to qualified immunity in Defendants' briefs. The court acknowledges this silence,

but, in light of the resolution of the claim against the Mayor, as discussed below, the court need

not address the issue further and will proceed to a discussion of the race discrimination claim.

All parties agree that Bratton has presented no direct evidence of race discrimination.

Therefore, Bratton must establish his case based on circumstantial evidence.  When addressing

claims of race discrimination based on circumstantial evidence, courts apply the same analytical

framework to claims brought under Section 1981 as those brought under Title VII.  *Rice-Lamar*

*v. City of Fort Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000).  To establish a *prima facie*

case of race discrimination based on circumstantial evidence, a plaintiff must show that (1) he

belongs to a protected class; (2) he was qualified to do the job; (3) he suffered an adverse employment action; and (4) the employer treated a similiarly situated person outside his class more favorably.  *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex. Rel. Univ. of S. Fla.,* 342 F.3d 1281, 1289 (11th Cir. 2003).

In many instances of alleged discrimination, the decision maker's awareness of a plaintiff's protected status is not an issue.  However, where awareness is an issue, a plaintiff must also present evidence of that awareness to establish his *prima facie* case.  This requirement is rooted in the goal of the analytical framework, which is to determine whether an inference of discriminatory intent exists, and the requirement acknowledges that no discriminatory intent could exist when the decision maker has no knowledge of the protected status.  So, providing evidence of the decision maker's awareness of the protected status is required when the protected status is not necessarily obvious, such as sexual orientation or early stage of pregnancy cases, or cases where the protected status may be obvious but the decision maker does not know the plaintiff.  *See, e.g.,  Lubetsky v. Applied Card Systems, Inc.,* 296 F.3d 1301, 1305 (11th Cir. 2002) (In a religious discrimination case, finding the plaintiff who presented no evidence that the decisionmaker *knew* of his protected status, and thus, had not established his *prima facie* case).

According to the Defendants, the instant case falls into the latter category.  They argue that Mayor May, the decision maker, did not know Bratton's race at the time he terminated him, and thus, May could not have discriminated against Bratton because of his race.  In his affidavit, Mayor May stated that he was unaware of Bratton's race at the time he terminated him.  May testified in his deposition that he now knows Bratton is white because he saw Bratton at his deposition, but that May could not recall ever meeting Bratton prior to that deposition.  May

claims he decided to fire Bratton based on a memorandum that listed employees names who had miscalculated overtime but that did not reveal their races. That same memorandum singled out Bratton as a newly-hired probationary employee. According to May, he considered the employees listed to be guilty of padding time and decided to terminate the one probationary "at will" employee who was on the list. If Bratton presents no evidence that counters that testimony to raise an issue of fact as to the Mayor's awareness of Bratton's race, then Bratton cannot meet his *prima facie* case.

Bratton presents no such evidence. Bratton does present evidence that some of his black co-workers made racial slurs and other references to Bratton's race. The court accepts the rather obvious fact that Bratton's co-workers knew he was white, but that fact does not solve Bratton's problem with his *prima facie* case. The evidence establishes that Mayor May and not any of those co-workers made the decision to terminate Bratton's employment.

Finally, the taunting statements that Kemp supposedly made to Bratton that Kemp was "going to get your white ass fired. . ." do have a racial content but the taunt is not evidence that Kemp met with the Mayor about Bratton, that he communicated with the Mayor about Bratton, or that he advised the Mayor about Bratton's race. In fact, Kemp and the Mayor specifically denied the existence of any such meeting and any such communication. In short, the court finds that no evidence exists that May knew Bratton's race at the time of his termination.

The court notes that, contrary to the statement in footnote ten of Bratton's responsive brief, no evidence exists that Kemp met with May in the Mayor's office at least twice. The Mayor denied meeting with Kemp in his office, and Kemp also denied such a meeting. Kemp did drop off an envelope for the Mayor with the Mayor's secretary, and testified that the envelope

had nothing to do with Bratton; it involved Kemp's work excuse.  The court advises all parties

that if they wish to present relevant facts to the court, they should include them in the fact section

of the briefs where the other party has an opportunity to respond to them, not solely in the

argument section and certainly not in obscure footnotes.  In any event, as noted previously in this

opinion, parties should be careful that *wherever* they state facts, they should not inadvertently

*mis*state them.

Having found that Bratton has presented no evidence that May, the decision maker, knew

Bratton's race, Bratton cannot meet his *prima facie* case on the race discrimination claims against

the City or against Mayor May individually.  The court therefore finds that Defendants' motion is

due to be GRANTED as to the race discrimination claims asserted in Count Three against the

City and in Count Four against Mayor May.

The court therefore could end its analysis of those claims. However, as an alternative

ruling, the court also finds that Bratton has failed to meet another element of his *prima facie*

case: the similarly situated comparator who was treated more favorably.  As Defendants note,

Bratton has identified no African-American employee who miscalculated his overtime during his

new hire probationary period who was treated more favorably.

A valid comparator is an employee who is "similarly situated in all relevant respects."

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Defendants argue that to be similarly

situated to Bratton, a comparator must be one who committed a similar infraction during a new

hire probationary period.  As support, they cite several non-controlling cases involving plaintiffs

who suffered an adverse employment action while in a probationary period where the courts

required the comparators also to be probationary employees to meet a *prima facie* case.  *See*, *e.g.,*

*Marshall v. Mayor & Alderman of the City of Savannah*, 366 Fed. Appx 91, 99 (11th Cir. 2010) (upholding district court's decision granting summary judgment against plaintiff, a newly- hired female probationary firefighter,  and noting that "[t]he record contains no evidence of a male firefighter who was on probationary status"); *Moore v.* Alabama, 989 F. Supp. 1412, 1419 n. 6 (M.D. Ala. 1997) (stating that during the evaluation of a plaintiff's *prima facie* case, a court should "focus on whether employees are similarly situated in terms of disciplinary record and employment status, i.e., whether the employee is probationary, tenured, part-time, etc. . . ."); *Martin v. City of Dothan*, No. 05-CV-1172, 2008 WL 541289 (M.D. Ala. Feb. 25, 2008) (rejecting comparators because the plaintiff "was in her probationary period whereas [the alleged comparators] were not"); *Garner v. Wiregrass Mental Health, Inc.,* No. 04-CV-325, 2006 WL 861354 (M.D. Ala. March 31, 2006) (finding that the plaintiff had not established her *prima facie* case; she was a probationary employee but her comparators were not, and thus, they were not similarly situated). As Defendants note, Bratton has identified no other employee of any race who miscalculated overtime during a new hire probationary period, and certainly has not identified an African-American new hire probationary employee who was treated more favorably.

Bratton claims that the court should accept as comparators African-American employees who miscalculated their overtime and were not terminated regardless of whether they were on probationary status. This court disagrees.  Probationary status is very relevant, particularly where, as here, the decision maker was aware of Bratton's probationary status and gave that status as the reason he terminated Bratton but not the others who miscalculated overtime.  Bratton was the only one listed on the memorandum whom he could fire without stating a cause and without being subject to an appeals process.

Bratton does present one African-American employee who miscalculated overtime, who was in a probationary period at the time, and who was not fired: Robert Lewis.  However, as Defendants point out, Lewis was not a newly-hired probationary employee.  Because Lewis was newly promoted, he was in a probationary period for his promotion and was subject to demotion. However, despite his probationary status, Lewis was a Regular Employee who could only be terminated for cause and he had rights to appeal the termination.  Thus, Lewis falls in a different category than Bratton, a newly-hired probationary employee who could be fired for a bad reason or no reason.  Further, Bratton has presented no evidence that May *knew* Lewis had any probationary status.  The memorandum that generated Bratton's termination singles out Bratton as the only one of the offenders who was on probationary status, and no evidence exists that May knew otherwise.

In any event, the court finds as an alternative ruling that Bratton has failed to present evidence of a similarly situated comparator outside his race who was treated more favorably. Accordingly, he has failed to establish his *prima facie* case and summary judgment is due to be GRANTED in favor of Defendants and against Bratton for this additional reason on claims of race discrimination.

As a point of clarification, the court recognizes that Bratton has presented evidence of racial slurs and arguable racial harassment from co-workers.  In the race discrimination section of his responsive brief, Bratton does not argue, however, that he was subjected to a racially hostile work environment.  Rather, he presents that evidence to support his argument that the articulated legitimate non-discriminatory reason for termination was a pretext for discrimination.  Because the court finds that Bratton did not establish his *prima facie* case, the court need not address

27

pretext arguments.

The court recognizes that Bratton feels he was unfairly treated;  indeed, because he was the only employee terminated out of nine who overstated overtime and because his supervisors characterize him as a good employee, the court acknowledges that his termination may well have been *unfair*.  However, the court's role is not to sit as "'a super-personnel department'" to re-examine the employer's business judgments and second-guess whether they were fair and appropriate.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2001).  Rather, this court's role is to determine whether the termination, unfair or not, was based on race *discrimination*.   In this case, the evidence demonstrated that the Mayor looked at a list of black and white employees who had overstated their overtime and chose to terminate the only one, Bratton, who was listed as being on probationary status.  Because Bratton has not proven his *prima facie* case of discrimination based on race, his case must fail as a matter of law.

4.   Violations of Ala. Code § 11-43A-45

Bratton has alleged that the City of Bessemer violated Ala. Code § 11-43A-45 (1975), which provides as follows:

> No person shall be appointed to or removed from, or in any way favored
> or discriminated against with respect to any municipal position or
> appointive municipal administrative office because of race, sex, political
> or religious opinions or affiliations.

This section applies only to council-manager form of government and not to the City of Bessemer, which utilizes the mayor-council form of government under Title 11-43 (doc. 23-12, ¶ 3). Further, the court notes that although Defendants addressed this claim in their motion for

summary judgment, Bratton did not discuss this claim in his responsive brief and, therefore,has therefore abandoned this claim. *See, e.g., Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned"); *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 13808, 1388 (11th Cir. 1997) (noting that "'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned'") (citation omitted, *reh'g granted and vacated by,* 136 F.3d 1294 (1998), *reinstated by* 166 F.3d 1332, 1336 (11th Cir. 1999) (*en banc*).

For all these reasons, the court finds that the motion for summary is due to be GRANTED as to the claim in Count V for violations of Ala. Code § 11-43A-45.

## IV.  CONCLUSION

For the reasons stated above, the court FINDS as follows:

MOTION TO STRIKE INADMISSIBLE HEARSAY: the court finds this motion is due to be GRANTED;

MOTION TO STRIKE TESTIMONY OF LEAVITT: the court finds this motion is due to be DENIED;

MOTION TO STRIKE TESTIMONY OF NON-SIMILARLY SITUATED EMPLOYEES: the court finds this motion is due to be DENIED;

MOTION FOR SUMMARY JUDGMENT:

• as to the claims against the City for violation of the FLSA set forth in Count One, the court finds that the motion for summary judgment is due to be DENIED;

• as to the claims against the City for FLSA retaliation set forth in Count Two, the court

finds that the motion for summary judgment is due to be GRANTED and the court will enter judgment in favor of the City and against Bratton;

•     as to the claims against the City for race discrimination set forth in Count Three, the court finds that the motion for summary judgment is due to be GRANTED, and the court will enter judgment in favor of the City and against Bratton;

•     as to the claims against Mayor May for race discrimination set forth in Count Four, the court finds that the motion for summary judgment is due to be GRANTED, and the court will enter judgment in favor of Mayor May and against Bratton;

•     as to the claims against the City for violation of Ala. Code § 11-43A-45, the court finds that the motion for summary judgment is due to be GRANTED, and will enter judgment in favor of the City and against Bratton.

This case will proceed to pretrial and trial with the claim asserted against the City in Count I (FLSA violation).  As no further claims remain against Mayor May, the court will dismiss him as a party Defendant.

The court will enter a separate Order contemporaneously with this Memorandum Opinion. Dated this 7th day of November, 2011.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

30